Al & Elly SKINNER, Plaintiffs–
Appellants,

v.

OSAGE COUNTY, Missouri, and Ralph Stoner, County Commissioner, Bernard M. Haslag, Sr., County Commissioner, Edgar C. Frank, County Commissioner, Hilda Ocheskey, Dalton Ocheskey, John Becker, Curtis Board, Robert Board, Arch Owens and Coy Owens, Defendants–Respondents/
Cross–Respondents,

and

Frederick Kinkead and Kathy Kinkead, Defendants–Cross–Appellants.

Nos. 58707, 58709.

Missouri Court of Appeals,
Eastern District,
Division Four.

Oct. 29, 1991.

James W. Gallaher II, Jefferson City, for plaintiffs-appellant.

James Loyd Elliott, Jr., Vienna, for defendants-respondents/cross-respondents.

Ronald Dwayne White, Rolla, for defendants-cross-appellants.

SATZ, Judge.

This is a dispute over whether a rural roadway traversing plaintiffs' land is private or public. Plaintiffs, Al and Elly Skinner, claim this roadway is their private road. To validate their claim they sued Osage County, the individual County Commissioners and several nearby property owners in a two count petition. In Count I, plaintiffs requested the court to enjoin the named defendants from using the roadway, and, in Count II, they requested the court to quiet title to the roadway in them. In answer, defendants alleged the roadway to be a public road.

The trial court declared the roadway to be public and denied plaintiffs request for an injunction. There is sufficient evidence to support the finding of a public roadway, but the court's description of the roadway so found is too vague to be enforceable. We reverse and remand with directions.

### Scope of Review

We review this court tried case under the well known principles established by *Murphy v. Carron*, 536 S.W.2d 30 (Mo.1976) and Rule 73.01(c). We defer to the credibility determinations made by the trial court, and we accept as true the evidence and the permissible inferences favorable to the prevailing party and disregard contrary evidence and inferences. *E.g., Snowden v. Gaynor*, 710 S.W.2d 481, 483 (Mo.App. 1986).

### Roadway in Dispute

The following schematic diagram is furnished to help describe the roadway in dispute.

As can be seen, the entire roadway in dispute lies within plaintiffs' property. Its east end abuts County Road 703. It runs west from there into the Gasconade River. The distance from the roadway's east end to the top of the river's east bank is 166 feet. The roadway descends this bank of the river, crosses a gravel bar and ends at the river's low water mark. The distance from the top of the river's east bank to its

low water mark is 75 feet. Boaters use the road to launch their boats into the river.

The undisputed portion of County Road 703 is a gravel road with a ditch along its side. This portion of the road has a "six inch base" with two inches of rock or gravel on it. The composition of the base is not disclosed. The disputed roadway has one to two inches of gravel on it and has no ditches along its sides. According to the surveyor, the disputed roadway is "not near the same character" as the undisputed portion of County Road 703.

The undisputed portion of County Road 703 is 15–20 feet wide, narrowing to about 10 feet at the point it abuts the disputed roadway. At this point, the disputed roadway is eight feet wide. It remains eight feet wide until it meets the top of the east bank of the river. At that point, it widens to thirteen feet and remains so as it descends from the top of the river's east bank to its bed.

### Statutory Dedication

■ There are a number of ways by which public roads may be established. Two of these are prescribed by statute. § 228.190 RSMo 1986.[1] One makes a road public if it is used by the public for 10 years and maintained through the expenditure of public money or labor for that same period. *Id; Claybrook v. Murphy,* 746 S.W.2d 140 (Mo.App.1988). Defendants' evidence here meets these requirements.

### Public Use

■ Most of defendants' witnesses were long time residents of the area and were familiar with the disputed roadway. Several of these witnesses said the public had used the roadway to ford the river and to launch boats for more than 80 years. Mr. Marcellus Miller, who was 99 years old at the time of trial, testified that his knowledge of the roadway in question began no

later than 1906. It had been, he said, the main road from the town of Cooper Hill on the east side of the Gasconade River to Linn, the county seat, on the west side. The roadway was "just as free as walking across the room, here." He said people had considered the roadway to be public "long before 1905" until plaintiffs fenced it off. Mrs. Hilda Ocheskey testified to public use of the roadway for access to the river from 1945 until the time of trial. Mr. Arch Owens, who was 80 years old at the time of trial and had lived on County Road 703 for most of his life, testified he had used the roadway for access to the river from the time he was 10 years old. He said you "didn't have to" ask permission to use the roadway and the roadway was "open to the public all the way through there." He said the public used the roadway to launch boats in the river from the 1930's to the present. Other witnesses offered similar testimony.

■ This evidence supports a finding of public use of the roadway for more than 10 years. To be public, it is enough if the use of the roadway "is free and common to all citizens, and that the public has actual access to it." This determination is not wholly dependent on the roadway's "length, or on the place to which it leads, or on the number of people who use it." *Dayton Township of Cass County v. Brown,* 445 S.W.2d 322, 325 (Mo.1969); *Wilson v. Sherman,* 573 S.W.2d 456, 460 (Mo.App.1978).

■ Plaintiffs argue that other testimony shows the public's use was contested by them and their predecessors in title and that permission was required to use the roadway to cross the river. The court was not required to believe this testimony. Moreover, § 228.190 requires only that the use be public, not that it be adverse. *Claybrook v. Murphy, supra* at 143; *State ex rel. Carter County v. Pennington,* 720

---

1. § 228.190 provides:

    All roads in this state that have been established by any order of the county commission, and have been used as public highways for a period of ten years or more, shall be deemed legally established public roads; and all roads that have been used as such by the public for ten years continuously, and upon which there shall have been expended public money or labor for such period, shall be deemed legally established roads; and nonuse by the public for five years continuously of any public road shall be deemed an abandonment and vacation of the same.

S.W.2d 779, 782–83 (Mo.App.1986); *Wilson v. Sherman,* 573 S.W.2d 456, 459 (Mo.App. 1978).

*Expenditure of Public Labor or Funds*

■ Mr. Weldon Wiegers testified that, as an Osage County employee, he graded County Road 703 four times a year from 1967 until 1988, the year he retired. At times, he would grade all the way to the water's edge, and, other times, he would turn around before reaching the water's edge. He testified he put gravel down on the roadway in question at least once a year, and graded all the way to the low-water mark of the river at least twice a year. He often had to turn his road grader around on the gravel bar which joins the east bank of the river at that point.

This supports the trial court's finding that "not many scarce dollars" were expended on the disputed roadway. It is not necessary "to prove a continuous maintenance by public money or labor for each and every year during the ten year period. It is sufficient to show that such maintenance began and continued from time to time during the ten year period as reasonably might be considered necessary and expedient by those in authority, and that such maintenance was sufficient to keep the road in condition for public travel." *State ex rel. Perkins v. Taylor,* 666 S.W.2d 853, 856 (Mo.App.1984); *Wilson v. Sherman,* 573 S.W.2d 456, 458 (Mo.App.1978); *Dayton Township of Cass County v. Brown,* 445 S.W.2d 322 (Mo.1969).

Plaintiffs argue that Mr. Wiegers did not testify that he was authorized to maintain the road all the way to the water's edge and that his actions therefore are not sufficient to support a finding of statutory dedication of the roadway under § 228.190. *Thompson v. County Court of Perry County,* 724 S.W.2d 686 (Mo.App.1987). Plaintiffs' reliance on *Thompson* is misplaced.

In *Thompson,* a landowner sought to force Perry County to maintain two roads on his land which the County contended had been abandoned. The trial court found for the County. On appeal, this Court af-

firmed. Because the landowner sought to compel the maintenance of the roads by the County, he had the burden of proving the roads were public roads. *Id.* at 687. Reviewing the evidence most favorably to the judgment, the Court noted "[t]here was arguably evidence that the requisite user [sic] occurred." *Id.* at 688. However, the Court also noted the "testimony was marked largely by confusion" and the "trial court is not required to view the testimony charitably." *Id.* Even if the trial court did believe the discredited testimony of a former county road grader, the Court said, his testimony merely established that he might have graded the roads in question without the direction or knowledge of county officials. *Id.*

Here, Mr. Weigers, the County employee who graded the roadway in dispute, said he was told by his County supervisors to "blade the county roads." He was shown specifically where to blade by his predecessor, Mr. Sam Owens, and Mr. Owens' directions included the grading or blading of the disputed section of the roadway. Viewed most favorably for the County, these operative facts support the inference that the County instructed Mr. Weigers to blade or grade the section of the roadway in question. The burden of going forward to rebut this inference shifted to plaintiffs. We have read the record. They did not meet this burden.

■ Plaintiffs also rely on *Mackey v. Weakley,* 439 S.W.2d 219 (Mo.App.1969) to argue that the grading of a road is not sufficient to support a finding of expenditure of public funds under § 228.190. In *Mackey,* the plaintiff sought a decree declaring a portion of a tract of land owned by the defendant to be a public road. The trial court found the disputed land to be a public road under § 228.190. *Mackey,* 439 S.W.2d at 223. On appeal, this Court reversed the trial court, concluding that the testimony of one witness that he had "run a grader" over the disputed area was not sufficient to prove expenditure of public funds under § 228.190. *Id.* at 224–225.

Plaintiffs' reliance on *Mackey* is misplaced. The Court in *Mackey* did not re-

view the trial court's decision under the standard set forth in *Murphy v. Carron. Mackey*, 439 S.W.2d at 223.[2] The Court took into consideration evidence which was contrary to the testimony of the witness regarding the grading of the disputed area. *Id.* at 225. Under *Murphy v. Carron*, we are required to disregard contrary evidence and inferences and accept as true the evidence and permissible inferences favorable to the prevailing party. Moreover, the present facts differ significantly from those in *Mackey*. Here, Mr. Wiegers did not merely run his grader over the disputed roadway, he put gravel down on the roadway at least once a year.

This does not end the matter, however.

### Trial Court's Judgment

■ To reflect its finding of a public roadway, the court entered judgment on Count II and stated "[t]he roadway is declared to be a public road all the way across the river; i.e., a ford". *Appendix*. This, obviously, is an inadequate description of the roadway declared public. No one knows where the public has the right to travel and, conversely, what travel would be trespass. *See, e.g.. Patterson v. Null*, 751 S.W.2d 381, 388 (Mo.App.1988).

This judgment was entered on May 31, 1990. Plaintiffs' notice of appeal was filed in this Court on July 23, 1990. Then, on October 9, 1990, some two and one-half months later, the trial court issued a document labeled "Judgment" in which it set out more specific findings of fact, including a detailed legal description of the section of roadway found to be public.

■ The October 9th "Judgment", however, cannot correct the defective description in the original judgment. After the filing of the notice of appeal on July 23, 1990, the trial court lacked jurisdiction to enter any subsequent judgment unless stipulated to by the parties, along with a withdrawal of the appeal, Rule 75.01, or, unless

the subsequent "Judgment" was no more than a nunc pro tunc correction of ministerial errors in the original judgment. *Lansing v. Lansing*, 736 S.W.2d 554, 558 (Mo. App.1987). The requirements of Rule 75.01 have not been complied with here, and the October 9th "Judgment" was a completely new judgment, making new and different findings of fact rather than simply making nunc pro tunc corrections of ministerial errors.

■ We are empowered to enter the judgment "the court ought to give." Rule 84.14. We are unable to do so here. The legal description of the road in the October 9th "Judgment" notwithstanding, the precise legal description of the roadway in issue is not readily apparent from the record. We must, therefore, reverse the judgment and remand the cause, with direction to the trial court to describe precisely the roadway in issue and made public, on the present record, if possible, or with additional evidence, if necessary.

On remand, one other issue must be addressed. The issue of the "public use of the gravel bar", tried by agreement of only some of the parties.

### Gravel Bar

■ At trial, counsel for the County raised the question of whether the "public use [extended onto] the gravel bar." The parties then agreed to address the "issue of the gravel bar" and to amend the pleadings to conform to the evidence. The court summarized the issue as "the publicness, if there is such a word, of the road ... and the publicness of the gravel bars. [sic]". At the close of the case, the court amended the pleadings "to conform to the evidence, including the utilization of the gravel bar," and, in its judgment, declared "the gravel bar is part of the river and is open to use by all persons lawfully on the river."

Two of the parties, Frederick and Kathy Kinkead, joined as defendants and served

---

**2.** "This being a case in equity we review the case upon the law and the evidence and determine the credibility, weight and value of the oral testimony and other evidence in the case, but in doing so we give due deference to the trial chancellor's findings as evidenced by its decree and do not set aside the judgment unless it is clearly erroneous." (citations omitted). *Id.* at 223.

with the original petition, filed no answer and did not appear at trial. Judgment was entered against them in default. They now appeal, contending that because they were not served with the amended pleadings putting title to the gravel bar in issue, the judgment on that issue is beyond the scope of the pleadings and is, therefore, void.

From our reading of the record, we cannot tell whether only the title to that portion of the gravel bar traversed by the roadway was in issue or whether title to the whole gravel bar was in issue. Since we must reverse the judgment and remand this cause for an appropriate description of the roadway in issue, we direct the trial court to take such action it deems appropriate to define specifically what is in issue with respect to the gravel bar and to resolve that issue with proper joinder of all required parties. To aid the trial court and the parties, we correct certain misconceptions and misstatements about the applicable law made in the record.

### Title To The Gravel Bar

In Missouri, title to the beds of navigable streams is in the State. *Conran v. Girvin*, 341 S.W.2d 75, 80 (Mo. banc 1960). The riparian property owners own title "to the shore of navigable streams down to the low water mark." *Id.* Therefore, on a navigable stream, the property line between a riparian owner and the State is the low water mark. *Id.* On a non-navigable river, the riparian owners own title to the bed of the river to its center-line or "thread". *Hobart–Lee Tie Co. v. Grabner*, 206 Mo.App. 96, 219 S.W. 975, 976 (1920).

Title to an island in a stream "follows the title to the land where found." *Conran*, 341 S.W.2d at 81. "[W]hen an island forms from the submerged land it is a form of vertical accretion to the bed." *Id.* Title to an island so formed in a navigable river is, therefore, in the State, and in a non-navigable river, it is in the riparian owner.

But, an island may be formed by another method. The river may cut "a new or additional channel, not by eroding away the intermediate lands but by jumping over them or running around them ... making a new and additional channel [while] leaving a part of the land of the riparian owner intact and identifiable...." *Id.* Title to that part of the land so cut off is owned by the riparian owner. *Id.*

However formed, any accretions to an island become the property of the owner of the island. *Volkerding v. Brooks*, 359 S.W.2d 736, 742 (Mo.1962). If the accretions to an island meet the mainland, the owner of the island owns all accretions to his shore to the point it physically meets another shore. *Id.* at 742–743.

A river is "navigable", with title to its bed in the State, if, in its ordinary condition, it is or may be used as a "highway for commerce". *Elder v. Delcour*, 364 Mo. 835, 269 S.W.2d 17, 22 (1954). Stated otherwise, a river is navigable if, in its ordinary condition, it "has [the] capacity and suitability for the usual purpose of navigation, ascending or descending, by vessels such as are employed in the ordinary purposes of commerce, whether foreign or inland, and whether steam or sail vessels." *Id.* It is the capability of such use by the public, rather than the particular extent and manner of that use which is determinative. *Tonkins v. Monarch Bldg. Materials Corp.*, 347 S.W.2d 152, 157 (Mo.1961).

This definition of "navigable" does not include, as it does in some other states, rivers which may only be floatable by small crafts like rowboats and canoes. *Elder, supra* 269 S.W.2d at 23; 78 Am.Jur.2d, Waters, § 382 (1975). In *Elder*, the disputed point of the river in question, the Meramec River in Dent County, was "navigable in fact by canoes, rowboats, and other small floating craft of similar size and nature, but [was] not navigable in fact by larger boats and vessels." *Id.* at 23. The river had also been used for floating logs and timber in the past. *Id.* at 22. The appellate court, however, stated the Meramec at that point was non-navigable as that term is used for the purpose of determining title. *Id.* at 23.

▆ The trial court here found the river to be a "commercially used river" because the river was once used to float railroad ties and logs and is now used for "commercial canoe livery". The court concluded that it was therefore a navigable river. The court reasoned that the gravel bar was part of the bed of a navigable river and therefore was "open to use by all persons lawfully on the river."

This judgment has several defects. The court failed to determine whether the gravel bar was formed by "vertical accretion" or by the river cutting a new channel. This defect may result from the limited and vague testimony about the formation of the gravel bar.

Mr. Wann, a witness for the plaintiffs, testified that "15 years ago" the gravel bar "came up, you see, and it kept getting larger and the river kept—the main current got on the other side." Mr. Owens, one of the individual defendants, testified that the gravel bar "made up out in the river and come to the bank." Mr. Owens did not testify when the gravel bar met the bank.

In addition, the present record does not support the court's finding the Gasconade River to be "navigable" at the location in issue. The relevant evidence is similar to that in *Elder, supra*. Here, one witness said that "when [she was] young" no logs, livestock, or grain was transported down the river. Other witnesses said the river could be and was used to float railroad ties and logs down-river, and canoes and fishing boats regularly floated down-river. In *Elder*, as noted, floating ties, logs and canoes on the Meramec did not show that river was used for commerce; likewise, that use of the Gasconade River here does not show commercial use.

▆ Finally, the present record does not show Frederick and Kathy Kinkead to be riparian owners who may have a valid claim to the gravel bar in question. The present record, therefore, does not show they were aggrieved by the trial court's judgment. § 512.020 RSMo 1986. Their appeal must be dismissed.

▆ On remand, if title to a part or all of the gravel remains in issue, the trial court should order plaintiffs to serve all riparian owners who may have a valid claim to the gravel bar as well as the proper public entity.

The appeal of Frederick and Kathy Kinkead is dismissed. The judgment of the trial court is reversed and the cause remanded for further proceedings consistent with this opinion.

SMITH, P.J., and CARL R. GAERTNER, C.J., concur.

## APPENDIX

May 31, 1990—Court finds:

The roadway in question is an ancient public way established in the early days of Osage County. While the county court, now commission, has not expended many scarce dollars on it, it has not been abandoned. The Plaintiffs' arguments that their deed shows the belief of their predecessor in her ownership is not persuasive. A reading of the deeds to the Renicks, Ocheskeys, Boards, etc. shows that plaintiffs' predecessor granted an easement for recreation to the *whole* farm. That is what plaintiffs should be losing sleep over. The road has been in continuous use by the public for as long as the area was settled.

The gravel bar is not land. Mother Nature's laws are immutable. Gravel bars move, some in dramatic flood, other in an undulating fashion from upstream toward downstream. When earth and gravel are built up on alluvial bends above the normal highwater mark, it is new land and accretes to the adjacent owner. As long as it is below normal high water—bankful but not flood—it is only riverbed of a navigable stream. While not liquid, it is still fluid. The Gasconade is obviously navigable—it was used for tie booming above the 703 crossing and is now used for commercial canoe livery. It is a commercially used river, it is navigable.

Now, for free from the judge of the court, I would hope the canoe liveries using this area of the Gasconade participate in the Conservation Commission trash bag

program. The busier "float streams" are actually cleaner than a few years ago. Also, civic youth groups can be attracted to do a "clean stream" by free canoes and livery during the week. It works on the Courtois and Huzzah.

Count I—Judgment for defendants.

Count II—The roadway is declared to be a public road all the way across the river; i.e., a ford.

Further, pursuant to oral request and pleading at trial, the court declares the gravel bar is part of the river and is open to use by all persons lawfully on the river.

Costs taxed to plaintiffs.

/s/ <u>John C. Brackman</u>
John C. Brackman
Circuit Judge, Division I